THE NASHVILLE, CHATTANOOGA AND SAINT LOUIS RAILWAY COMPANY *v.* HEGGIE BROTHERS.

1. Under section 4386 of the Revised Statutes of the United States, for a railroad company to keep live-stock upon its cars for more than twenty-eight consecutive hours without unloading the same for rest, water and food, is negligence *per se;* and such company is liable, not only for the penalty prescribed in the statute, but also for any damage or injury that may thereby be sustained by the owner of the stock.

2. That the company's stock-yards at its feeding station were on fire when the train arrived there, was no sufficient excuse for not furnishing to the person in charge of the horses, in compliance with the contract of shipment, all proper facilities for taking care of them, nor for not stopping the car containing them there or at some other station, in compliance with the statute, so that they might be unloaded, watered and fed.]

3. Nor is the company excused from liability by the fact that the person in charge of the stock was deficient in urging compliance with the statute, for the company's servants should have known of such want of diligence on his part, and it was their duty to select the place for stopping with or without his request.

November 21, 1890.

Carriers. Negligence. Railroads. Contracts. Livestock. Before Judge Eve. City court of Richmond county. November term, 1889.

Reported in the decision.

J. B. Cumming and Bryan Cumming, for plaintiff in error.

Fleming & Alexander, contra.

Simmons, Justice.

This was an action brought by the defendants in error against the plaintiff in error for damages caused to a certain car-load of horses by reason of the negligence of the plaintiff in error in not stopping its cars so as to give the defendants in error an opportunity to water and feed their horses. A verdict was had for the defendants in error, and the railway company moved for a new trial, which was denied by the court, and it excepted to this ruling, alleging as error the special grounds set forth in its motion.

The evidence showed that the horses were shipped from St. Louis to Augusta, and had been on board of the train about twenty-six hours when the train arrived at Nashville; that the person in charge of the horses made inquiries of certain persons about the train as to getting the horses off and having them fed and watered, and was told that this could not be done; the stock-yards of the company were on fire when the train reached Nashville; no opportunity was afforded to the agent of the defendants in error to unload the horses for the purpose of feeding and watering them, by the railroad company or any of the employees thereof, but

the car in which the horses were loaded was attached to another train which proceeded through to Chattanooga, without giving an opportunity at any intermediate station for the horses to be taken care of. The special contract under which the horses were shipped was put in evidence, to the following effect: that the tariff rate on the shipment to Augusta was $226.00 per car; that in consideration of the fact that the car was to be transported for $113.00 and a free passage to the owner or his agent, on the train with the animals, this being a special rate lower than the regular rate, the shipper released the railroad company and its connecting lines from the liability of a common carrier in the transportation of the animals, and agreed that such liability should be only that of a private carrier for hire; that the shipper agreed that he would load and unload the animals at his own risk, and feed, water and attend the same at his own expense and risk while they were in the stock-yards awaiting shipment, and while on the cars or at feeding or transfer points, or where they might be unloaded for any purpose; that while the employees of the railroad should provide the owner or person in charge of the animals all proper facilities on trains and at stations for taking care of the same, the business of the railroad should not be delayed by the detention of the trains to unload and reload the animals for any cause whatever, but the car might be left at a station, upon the request of the person in charge of the same, and unloaded and reloaded by him; that should damage occur for which the railroad might be liable, the value at the date and place of shipment should govern the settlement, in which the amount claimed should not exceed, for a horse or mule, $100.00, which amount it was agreed was as much as such animals were reasonably worth. This agreement was dated February 14th, 1889. It was shown by the

evidence that neither the railroad company nor any of
its employees provided the person in charge of the ani-
mals with any facilities whatever for taking care of the
same, notwithstanding it appears that the person in
charge, in behalf of the owners of the horses, applied
to various persons who seemed to be connected with
the railroad, for permission and opportunity to unload
the cars at Nashville in order that he might feed and
water the animals and give them the required rest after
their long journey. Nor were the cars left at Nash-
ville, which was a feeding station, but they were
attached to another train which proceeded through to
Chattanooga. It is very clearly shown by the testi-
mony that the damage to the stock was caused in con-
sequence of the fact that they were kept on board of
the cars for over forty hours, without rest or food or
water. Therefore, we think the verdict of the jury was
warranted by the testimony in the case.

Section 4386 of the Revised Statutes of the United
States provides that "No railroad company within the
United States, whose road forms any part of the line
of road over which cattle, sheep, swine, or other ani-
mals, are conveyed from one State to another, or the
owners or masters of steam, sailing or other vessels
carrying or transporting cattle, sheep, swine, or other
animals, from one State to another, shall confine the
same in cars, boats or vessels of any description, for a
longer period than twenty-eight consecutive hours,
without unloading the same for rest, water and feeding,
for a period of at least five consecutive hours, unless
prevented from so unloading by storm or other acci-
dental causes." We think, under this statute, that
where a railroad company keeps live-stock upon its
cars for more than twenty-eight consecutive hours, this
constitutes negligence *per se*, and such railroad com-
pany is liable, not only for the penalty prescribed in

the statute, but also for any damages or injury that may thereby be sustained by the owner of the stock. We furthermore think that, under the contract between these parties, it was the duty of the railroad company to have afforded the person in charge and having care of these animals an opportunity to unload the same upon their arrival at Nashville, or at some other place, when they had been upon the cars twenty-eight consecutive hours; and having failed to afford this opportunity of feeding and watering the stock and giving them the required rest, the railroad company is liable for the consequences of any injury to the animals that may have ensued thereby. And while the statute of the United States was an act in favor of humane treatment of animals while being transported, yet we think that a violation of the same on the part of the railroad company was negligence in itself for which they would be liable. So we think the verdict of the jury was not without evidence to support it; nor do we think it was contrary to law. The fact that the stock-yards of the defendant were on fire when the train arrived at Nashville was not sufficient excuse for not furnishing to the person in charge of the animals, under the contract, all proper facilities for taking care of the same; nor was it a sufficient excuse for not stopping the car five hours, there or at some other station, as provided for in the statute, so that the animals, after they had been upon the cars twenty-eight consecutive hours, might be unloaded and watered and fed by the person in charge.

Should it be thought that the agent of the owner in attendance upon the stock was deficient in urging compliance with the statute, the railroad employees knew or should have known of that want of diligence on his part; and as it was for them to select the place for stopping and to comply with the statute, with or without his request, his failure in diligence is no excuse for

the company under the act of Congress. The owner of
the stock not being present, his servant and the com-
pany's servants had no right as against him to violate
the statute any more than as against the United States.

*Judgment affirmed.*