| 77 | 357 |
| f79 | 62 |
| 81 | 382 |

| 77 | 357 |
| 85 | 299 |
| 85 | 318 |

ST. LOUIS SOUTHWESTERN RAILWAY COMPANY v. CLAY COUNTY

GIN COMPANY.

Opinion delivered January 6, 1906.

1. CARRIER—DELAY IN FURNISHING FACILITIES OF TRANSPORTATION.—While a carrier for such goods as he undertakes to carry is bound, under Kirby's Digest, § 6804, to provide without delay reasonable facilities of transportation to all shippers at every station who in the regular and expected course of business offer their goods for transportation, he is not required to provide in advance for any unprecedented and unexpected rush of business, and therefore will be excused for delay in shipping, or even in receiving goods for shipment, until such emergency can in the regular course of business be removed. (Page 361.)

2. SAME—DISCRIMINATION AMONG SHIPPERS.—To constitute actionable discrimination in the matter of failing to furnish transportation facilities, under Kirby's Digest, § 6804, there must be some undue or unjust preference of one shipper over another. (Page 362.)

Appeal from Clay Circuit Court, Eastern District; ALLEN N. HUGHES, Judge; reversed.

STATEMENT BY THE COURT.

On the 3d day of August, 1903, the appellee instituted this action against the appellant, and alleged that it was a railway cor-

poration operating a line as a common carrier in Missouri and Arkansas, and the appellee was in the months of October, November, and December, 1902, engaged in shipping cotton seed from the town of Rector, in Clay County, Arkansas, to a customer at Cairo, Ill., and that during said months it had for shipment 65 tons of seed of the market value of $16 per ton, which were to be shipped over appellant's line, and it made demand through appellant's agents at Rector for cars to ship said seed, and the appellant negligently failed and refused to provide transportation for the same, and that by reason of said failure said seed rotted, whereby appellee was damaged in the sum of $850.

The appellant answered, and denied that it at the time mentioned, or any other time, either carelessly, negligently or otherwise failed and refused to furnish and provide transportation for the shipment of appellee's cotton seed, and denied that, by reason of its failure to furnish cars for the shipment of same, any part of the seed rotted or spoiled, and denied that plaintiff was damaged in the sum of $850 or in any other sum.

Appellant further alleged that it was engaged in transporting interstate commerce, and the freight mentioned for shipment was to be transported out of the State of Arkansas through the State of Missouri, and therefore became interstate freight, and under the laws it had to furnish cars and facilities to all of its patrons alike. That at the time it was claimed the seed rotted and spoiled there was an unusual and unexpected demand for cars from the various shippers of such products as cotton, cotton seed, wheat, corn, flour, lumber, cattle, horses, hogs and many other classes of freight, and, on account of the unexpected and extraordinary demand for cars, it was unable to supply the demands during the months of October, November and December. That it apportioned its cars to the various shippers in proportion to the respective wants and needs as fairly and equitably as it was possible for it to do.

The proof on behalf of appellee showed that during the months of October and November it tendered to appellant cotton seed for shipment in carload lots, and demanded cars for such shipment; that appellant failed to furnish it the cars it needed, and that, on account of its failure to get the necessary cars, it lost 65 tons of cotton seed, worth from $15 to $17 per ton. Witnesses for

appellee testified that there were others engaged in the same business of shipping cotton seed from Rector station, and that, while appellee failed to receive cars on its demand therefor, the other parties received cars regularly.  But these witnesses on cross-examination all answered that they did not know how many cars the other shippers received during the months of October or November, nor did they know how many cars the appellee received during those months.  It was shown that from the 3d to the 10th of October the appellee received three cars, while the Rector Gin Company during the same period received seven cars. During this period appellee lost seed which it would not have lost had cars sufficient been furnished it.  Demand was made daily upon appellant for cars, and the company was notified that the cotton seed of appellee was rotting for lack of cars in which to load same when it was ready for shipment.

On behalf of appellant the proof showed that during the months of October and November there was a shortage in cars, brought about by an unforeseen and extraordinary accumulation of freight, and by other conditions which the transportation agent and the chief train dispatcher of appellant explained as follows: A. B. Liggett testified that "he was its superintendent of transportation, and had charge of the car service in Missouri and Arkansas.  All customers shared alike in a shortage.  There was a shortage of cars in the months of October and November.  In October, 1902, there was an average daily shortage in Missouri of 104 cars per day, and in Arkansas 175 cars per day.  In November they had a daily shortage in Missouri of 244 cars and in Arkansas of 644 cars.

At that time the company had seven cars per mile for each mile of its main line or branches, or about 7,000 cars, which compared favorably with other roads in Arkansas and Missouri. That they now had nine cars to the mile.  In explaining the shortage witness said:  "It is quite a long story how cars are handled. If we had fifteen cars to the mile, and we loaned six cars of it to other roads, and the other roads didn't give us any assistance, we would soon be out of cars.  The rule is, our connections should furnish us their *pro rata* of cars for our cars loaded to be shipped by way of their line, and their connections are also supposed to furnish their *pro rata* of cars; or, in other words, for business

loaded on our lines and going over the I. C. and over their road we frequently get 500 or 600 cars from them in a short time. Now, during the fall of 1902 the condition in what we call the Eastern territory was very bad. The lines all got congested; had more business than they could handle. The lines were blocked, so that they could not move the cars, and we had thousands of cars off of our own line that could not be sent back home to us. We got our cars away from home, and could not get them back. Our immediate connections did not have any cars to give us. That is true of the I. C. and C. & E. I., and previous to this they had been giving us a large number of cars to help us out."

Witness said that during the fall of 1902 the demand for cars was greater than it had ever been before. There were a great many new mills along the line of the road. They anticipated some increase in the business in the summer of 1902, and ordered 1500 new box cars, and they were loaded and gone before they knew they had them. When they ordered the cars, they thought they would be sufficient to handle the business, but they were not. They could not anticipate the congested condition of freight on connecting lines in time to have provided cars.

O. E. Maer testified that "he was chief train dispatcher in October and November, 1902, and there was a shortage of the cars at that time. That the conditions were different from what had been in former years. They were unable to procure any cars away from home, and when their cars got away from home they were unable to get them back. They had not anticipated such a shortage." On the question of the distribution of cars this witness further testified that "he had charge of the distribution of the cars under the direction of the superintendent of transportation, and he tried to make an equitable distribution of the cars. A portion of the time they were only able to fill about 50 per cent. of the orders, and at other times about 25 per cent., but he would send cars to the agents, make requisition requesting them to distribute the cars according to the demand. That they tried to help everyone and do justice to all."

On this subject W. E. Lynch testified: "He was agent for the appellant at Rector in the fall of 1902, and was acquainted with all of the gin companies there. He made requisition for cars, and furnished them as rapidly as he could get them. Witness then

produced a list of cars disclosing that he had furnished the Clay County Gin Company in September 5 cars; the Rector Gin Company 6 cars.  In October he furnished the Clay County Gin Company with 17 cars, and the Rector Gin Company with 17 cars.  In November he furnished the Clay County Gin Company with 10 cars, and the Rector Gin Company with 7 cars.  He had furnished the Clay County Gin Company with 3 cars from October 3d to October 10th, and to October 10th he had furnished the Rector Gin Company with 6 cars.  That he had no intention of discriminating, and it was not a discrimination.  He kept the record of the cars ordered, and when they arrived he distributed them in proportion to the number of cars ordered."

This witness was asked to explain why he had delivered to the Clay County Gin Company 3 cars from the 3d to the 10th of October, and had during the same time delivered to the Rector Gin Company 6 cars, and answered: "Why I cannot say at this time, unless it was that the Clay County Gin Company may not have been ginning steady at that time.  I do not know that they demanded them every day." .

*S. H. West* and *J. C. Hawthorne*, for appellant.

Although carriers are under obligation to provide all necessary cars for such freight as may be ordinarily expected, yet when an unexpected and unprecedented amount of freight accumulates, they are excused from accepting such freight for transportation until such time as they can with reasonable diligence transport it. 22 Am. & Eng. R. Cases, 441; 4 *Ib.* 380; 99 Mass. 508; 43 L. R. A. 225 and notes; 61 Ark. 560.  Appellant is not liable for damages to perishable property resulting from appellee's own negligence.  56 Ark. 279; 38 Ark. 371; 39 Ark. 344; 4 Fed. 862.

*F. G. Taylor*, for appellee.

The verdict is sustained by the evidence, and is not excessive. 56 Ark. 279; 5 Am. & Eng. Enc. Law, 368; 55 Ark. 163.

WOOD, J., (after stating the facts.)  This was an action under section 6804 of the Digest (Kirby's) for failing to furnish cars.  That section among other things provides: "It shall be unlawful for any person or corporation engaged alone or associated with others in the transportation of passengers or property by railroad in this State, as freight or express, * * * to

make any preference in furnishing cars or motive power. And all persons or corporations engaged as aforesaid shall furnish, without discrimination or delay, equal and sufficient facilities for the transportation of passengers, the receiving, loading and unloading, storing, carriage and delivery of all property of a like character carried by him, them or it; and shall perform with equal expedition, and at uniform rates, the same kind of services connected with the contemporaneous transportation thereof as aforesaid," etc. Section 6808 provides the penalty for a violation of the act.

The statute did not intend to make the duty of carriers to furnish transportation facilities an absolute one, for it would be unreasonable to conclude that the Legislature intended to impose upon them duties that under certain conditions could not be anticipated by them, and which it would be impossible to perform, and yet for such nonperformance to exact of them heavy penalties. The statute under consideration is but declarative of the requirements of the common law as to the duty of furnishing transportation facilities. After declaring what that duty is, it prescribes the penalty for its nonperformance.

"A common carrier for such goods as he undertakes to carry, is bound to provide reasonable facilities of transportation to all shippers at every station who, in the regular and expected course of business offer their goods for transportation. The carrier is not required to provide in advance for any unprecedented and unexpected rush of business, and therefore will be excused for delay in shipping, or even in receiving goods for shipment, until such emergency can in the regular and usual course of business be removed." *Little Rock & Ft. Smith R. Co.* v. *Oppenheimer*, 64 Ark. 271, 279; 4 Elliott, Railroads, § 1470; Hutch. Car. § 292; 6 Cyc. 372, note 2.

To be sure, the carrier is liable where he fails entirely to furnish transportation. But the liability of the carrier under the act of March 11, 1899 (Kirby's Digest, § 6804), is founded, not so much on the inadequacy of the facilities at his command to supply the demands of shippers, as on his refusal or failure to make the facilities, which he has, available to all who are similiarly situated, without discrimination or delay. For the act makes it the duty to furnish without discrimination or delay. So, if the

carrier, by reason of some unforeseen and unusual or unprece-dented condition in the traffic, is unable to furnish cars for the accommodation of all shippers, he must, in order to escape liability under this statute, furnish such·as he has to all shippers without discrimination or delay.

It is conceded that appellant failed to furnish to the shippers of cotton seed at Rector all the transportation needed, but its failure to do this is accounted for in a way to exempt it from liability according to the doctrine above mentioned.   So the ques-tion at last is, did appellant discriminate against the appellee in furnishing what cars it could procure?   In *Little Rock & F. S. R. Co.* v. *Oppenheimer, supra,* and *Choctaw, O. & G. Rd. Co.* v. *State,* 73 Ark. 373, it is shown that, to constitute actionable dis-crimination in the matter of failing to furnish transportation facilities, there must be some undue or unjust preference, some-thing in the facts tending to show that the conduct of the carrier was superinduced by a desire to favor one shipper over another, to give an unjust preference to one over the other, and thereby to attempt to create a monopoly—to "pull down one man's busi-ness while building up another's."   But if the facts show that "those who are in substantially the same situation with reference to the carrier are treated with the same consideration and accorded the same privileges, there can be no actionable discrimination."

Now, here the shippers were in substantially the same situa-tion, and, it seems to us, the uncontradicted facts show that they were given substantially the same facilities for transportation during the cotton season.   In September appellee was given five cars, and the Rector Gin Company, a rival shipper, was given six; but in November the appellee received ten cars, while the Rector Gin Company received only seven, and in the month of October, appellee and its rival each received seventeen cars.   True, the proof shows that from the 3d to the 10th of October appellee received only three cars while its rival received six, but during that entire month they each received the same number.   Had appellee received cars from the 3d to the 10th of October to make it equal to the Rector Gin Company, it would have been entitled to only one car more, as there could not be fractional cars.   It is in the very nature of the business impossible for mathematical precision to be observed in the manner of the distribution of cars

to the various shippers at any given station.  This necessarily results from the difference in the demands that will be made by different shippers, although they may be in substantially the same situation with reference to the carrier and the commodity to be shipped.  The undisputed facts here convince us that there was no such difference as to constitute a discrimination, within the purview of the above statute.

Reversed and remanded for a new trial.