ST. LOUIS SOUTHWESTERN RAILWAY COMPANY v. MITCHELL.

Opinion delivered December 4, 1911.

1. CARRIER—LIABILITY FOR INJURY TO LIVE STOCK.—When a common carrier accepts live stock for transportation, knowing at the time that the condition of its facilities is such that a loss will result to the shipper by reason of the shipment, it will be responsible for the resulting loss. (Page 292.)

2. SAME—WHEN LIABILITY FOR LIVE STOCK BEGINS.—The liability of a carrier of live stock begins the moment they are received for transportation. (Page 293.)

3. SAME—INTERSTATE COMMERCE—LIMITING LIABILITY.—In case of an interstate shipment a railway company can not by contract limit its liability for loss caused by it. (Page 293.)

4. SAME—NEGLIGENCE IN SHIPMENT OF LIVE STOCK.—In case of an interstate shipment of live stock, no consent of the shipper, either before or after the stock was accepted for shipment, would exempt the carrier from liability for a failure to unload the stock at the usual stopping place, if such failure on its part was the cause of injury to the stock. (Page 293.)

5. SAME—LIVE STOCK—NEGLIGENCE.—It is the duty of a carrier of live stock to furnish all necessary facilities for their proper rest, exercise and refreshment; and while the shipper can not arbitrarily demand of a carrier that it unload the live stock at any particular time or place, yet, if the carrier has established a usage of unloading live stock at a certain place, the shipper has the right to expect such usage will be observed; and, if it is not observed, the carrier is liable for the resulting loss. (Page 294.)

Appeal from Craighead Circuit Court, Jonesboro District; *Frank Smith*, Judge; affirmed.

*S. H. West* and *J. C. Hawthorne*, for appellant.

1. In the absence of necessities existing for unloading stock for feed and rest, to which the carrier's attention has been called, it is under no legal obligation to do so under a period of twenty-eight hours from the time the stock was loaded into the cars. A carrier discharges its full duty when it affords reasonable opportunities for feeding, watering and resting the stock; but it is not required to supply these opportunities upon the mere request of the owner without regard to the necessity for the demand. Rev. Stat. U. S. § 4386; 79 S. W. 827; 69 Miss. 191; 61 Am. & Eng. Ry. Cas. 322; 86 Ga. 210; 68 Miss. 554; 74 Mo. 351; 22 So. 835; 27 So. 323; 41 Fed. 913. The court erred in instructing the jury that if the failure to unload the hogs was the direct or proximate cause of their death, the appellant

would be liable, provided its agent in the exercise of reasonable judgment and intelligence should have known and appreciated the importance and necessity of unloading the hogs at Jonesboro.    50 Ark. 397; 56 Ark. 424.

The court also erred in charging the jury that the fact that the stock pens were overcrowded would be no excuse for failure to receive and unload the hogs.    83 S. W. 20;  64 Ark. 271; 79 Ark. 59; 85 Ark. 311;  217 U. S. 698.

*Lamb & Caraway,* for appellee.

1.   The court properly modified the third instruction so as to charge the jury that the appellant was not liable for heat, overloading, etc., unless the loss and damage was the result of carelessness or negligence on the part of the company. Appellant could not legally exempt itself from liability for damages resulting from its own negligence.

2.   If the appellant received the hogs, knowing that its pens at Jonesboro were so overcrowded that it could not unload the stock, the fact that the pens were overcrowded would not excuse appellant for failure to unload the stock if it was otherwise liable.   A railway company may under certain conditions refuse to receive live stock or perishable freight;  but if it does receive the stock or perishable freight, it can not exempt itself from liability for delays in shipment, or for failing to care for or afford the shipper reasonable opportunity to care for the property thereafter.   2 Hutchinson on Carriers, § § 634, 638.

3.   The court correctly instructed the jury that if in the exercise of reasonable judgment and intelligence the agent of appellant should have known and appreciated the necessity of unloading the hogs at Jonesboro, and that appellee demanded that they be unloaded, and the failure to unload was the direct and proximate cause of the death of the hogs, the verdict should be for the plaintiff.

Wood, J.   On the 4th day of December, 1909, the appellee loaded two car loads of hogs in 36 ft. cars at Pekin, on the line of the Jonesboro, Lake City & Eastern Railway, about 10 miles east of Jonesboro.   There were 158 hogs, weighing from 120 to 130 lbs., put in one car, and 144 hogs, averaging about 165 lbs., were put in the other car.   The temperature at the time of this shipment ranged from 56 to 42 degrees. The hogs arrived on the connection between the Jonesboro,

Lake City & Eastern Railway and the appellant's line about 9:30 P. M., and were received by the appellant about 11:00 P. M., and shipped out of Jonesboro to destination at 12:15 A. M. next day. The shipment was made by appellant under a contract, wherein the appellee agreed that the defendant should be exempt from liability for loss arising from heat, suffocation, overloading, carrying and other accidents not arising from its negligence. And the appellee in the same contract assumed all risk, the expense of unloading, feeding and watering and otherwise caring for the stock while in the yards or pens. The stock arrived at Illmo, Mo., on December 5, 1909. The appellee brought this suit against the appellant to recover damages for the loss of his hogs, alleging that when the two cars arrived at Jonesboro he demanded that they be unloaded before being forwarded to their destination, and that the apppellant refused to unload the hogs, or permit them to be unloaded, and that, by reason of the refusal of the appellant to unload the hogs, they died *en route* between Jonesboro and Illmo, and that appellee was damaged thereby in the sum of $471.75. The appellant's answer admitted that it received the hogs for shipment at time mentioned, but denied that appellee requested them to be unloaded, and denied that it refused to permit the hogs to be unloaded, and alleged that they died either from disease or from overloading them. The appellant also set up the contract above mentioned.

The testimony on behalf of appellee tended to prove that between 5 and 6 o'clock on December 4, 1909, appellee told the shipping clerk and agent of appellant at Jonesboro that the hogs had been shipped from Pekin and would arrive that evening, and that he wanted appellant to unload them when they arrived at Jonesboro, and that the custom of appellant had been with hogs delivered to it from Lake City road to unload them at night at Jonesboro, and let them rest until the next morning, and then ship them out on the fast stock train, and that appellant requested that his hogs be unloaded in accordance with this custom. It appeared that it would require from 30 minutes to an hour to load a car of hogs at Jonesboro. The appellant refused to unload the hogs, giving as a reason for its action in so doing that the pens were full, and that they had no room for them, and that the hogs would either have

to remain on the sidetrack during the night or be moved on the first outgoing train. The appellee consented for the hogs to be shipped on the first train out of Jonesboro, rather than have them remain in the standing cars until the next morning.

There was testimony on behalf of appellee tending to show that the hogs were not overloaded, and also that they were not diseased, and the verdict of the jury on these questions must be taken as conclusive against appellant. The testimony on behalf of appellant tended to show that the appellee did not make any request of its agents and servants at Jonesboro to have the hogs unloaded, and that on account of the crowded condition of its stock pens on that night it could not and did not receive or accept the hogs, except upon the condition that they should be shipped out that night on the first train; that the accumulation of stock in its stock yards on that evening was not and could not have been anticipated by appellant, as it was an unusual condition; that the hogs were overloaded before it received them for shipment, and that appellant had no notice of that fact.

We have held that a carrier is not required to provide in advance for any unprecedented and unexpected rush of business, and that he will therefore be excused for delay in shipping or in receiving goods for shipment until such emergency can in the regular and usual course of business be removed; citing *St. Louis S. W. Railway Company* v. *Clay County Gin Co.*, 77 Ark. 357. But that is not this case.

Where a common carrier accepts live stock for transportation, knowing at the time that the condition of its facilities is such that a loss will result to the shipper by reason of the shipment, then such carrier will be responsible for the loss, because carrier will be negligent in undertaking the shipment under such conditions. The jury might have found from the evidence in this record that such was the case here.

The appellee testified that it had always been the custom to unload at Jonesboro, because they got a better run; if they unloaded them, they got on a stock train in the morning that got out about 7:30. Appellant had established the custom presumably for the reason that it was necessary in the proper transportation of hogs. It was shown that the hogs of appellee, when they were received by appellant for shipment, were in

good condition, that they were free from disease, and that they were not overcrowded in the cars; in other words, that the cars were not overloaded.

The testimony of appellee tended to show that his hogs that died were the largest and fattest ones, and that it was necessary to unload such hogs at Jonesboro in order to prepare them for shipment through to St. Louis.

One witness stated that when hogs were loaded in cars when standing still they soon get hot if the air is not stirring, and of course they soon suffocate if the weather is not awful cold, and that when cars are moving hot air passes out and they get the breeze. The usual and ordinary effect on hogs in a car 19 or 20 hours is that they are apt to get too hot and die. There were several stops of 30 or 40 minutes between Jonesboro and Illmo. There was ample evidence to sustain the finding of the jury to the effect that, if the hogs had been unloaded at Jonesboro, as it was the custom of appellant to do, they would not have died. There was evidence to support the verdict that the loss of the hogs was caused through negligence of appellant. The appellant's liability as a common carrier of live stock began the moment it received the hogs of appellee for transportation. *St. Louis, I. M. & S. Ry. Co.* v. *Lesser,* 46 Ark. 236; *Fordyce* v. *McFlynn,* 56 Ark. 424. And, as this was an interstate shipment, it could not by any contract with appellee limit its liability for loss caused by it. Appellant, having received the hogs for transportation, could not relieve itself of liability for loss caused by its failure to unload same at Jonesboro on the ground that appellee had consented for the hogs to be shipped out of Jonesboro on the train that night. No consent of appellee, and no contract with appellee either before or after the hogs were delivered to appellant for transportation, would exempt appellant from liability for a failure to unload the hogs at Jonesboro if such failure on its part was the cause of the loss. *Chicago, R. I. & P. Ry. Co.* v. *Miles,* 92 Ark. 573; *Kansas City Southern Railway Co.* v. *Carl,* 91 Ark. 97. Therefore the court did not err in instructing the jury as follows: "If you find from the evidence that the defendant railway company received two carloads of hogs from the Jonesboro, Lake City & Eastern Railway Company for transportation to East St. Louis, knowing that its stock pens at Jonesboro were

so overcrowded that said stock could not be unloaded, then the fact, if it be a fact, that said stock pens were so overcrowded will not excuse the railway company if it is otherwise liable." On the question of negligence the following principles apply to the facts of this case.

It is the duty of a common carrier of live stock to furnish all necessary facilities for the proper rest, exercise and refreshment of the animals received by it for transportation. The times when, and places where, rest and refreshment may be necessary must be left to the judgment of the carrier, and not the shipper. The shipper can not arbitrarily demand of the carrier that it unload the live stock at any particular time or place; but where the carrier has established a usage of unloading at a particular place for the proper care and necessary preservation of certain live stock, the shipper, in delivering his stock to the carrier for transportation without any notice of a change of usage, has the right to expect that such usage on the part of the carrier will be observed, and, if it is not observed, resulting in loss to the shipper, he may hold the carrier responsible for such loss. *Illinois Cent. Ry. Co.* v. *Peterson,* 68 Miss. 454; *Missouri, K. & T. Ry. Co.* v. *Clark,* 79 S. W. 827; *Nashville, C. & St. L. Ry. Co.* v. *Heggie,* 86 Ga. 210; *McAlister* v. *Chicago Ry. Co.,* 74 Mo. 351; Hutchinson on Carriers, § 638, and cases cited in note. Under the pleadings and evidence adduced in support of the respective contentions, it was a question for the jury as to whether the loss sued for was caused by the negligence of the appellant in failing to unload hogs at Jonesboro, or by the negligence of the appellee in overloading the cars.

The issues were submitted to the jury under instructions that were really more favorable to appellant than the law warrants, and of which it has no cause to complain. The judgment, therefore, was correct, and it will be affirmed.