CHICAGO, ROCK ISLAND & PACIFIC RAILWAY CO. *v.* BUTLER.

Opinion delivered January 14, 1918.

1. CARRIERS—DAMAGE TO SHIPMENT OF CATTLE—AMOUNT.—In an action for damages to a shipment of cattle, due to negligence, where it appeared that five of the cattle died, a verdict of $100 will not be deemed excessive.

2. CARRIERS—DAMAGE TO SHIPMENT OF CATTLE—LIABILITY.—Where a shipper is invited by a carrier to tender to it his stock for shipment, and the shipper does so pursuant to this invitation, the shipper may presume that the carrier has provided and will furnish the facilities needed, and if, through the lack of facilities, the shipper be compelled to load his cattle into cars prematurely, and they are compelled to stand in the cars an unnecessarily long time before the cars are put in motion, the shipper may recover damages to compensate the loss sustained thereby.

Appeal from Grant Circuit Court; *W. H. Evans,* Judge; affirmed.

*Thos. S. Buzbee* and *H. T. Harrison,* for appellant.

The verdict is excessive and under the undisputed evidence, no liability was shown. 84 Ark. 311. No negligence was shown, nor proof of overloading or crowding. The facilities were ample and the plaintiff had charge of the loading. He knew the train would not arrive until 9 o'clock. The verdict is not supported by the evidence.

*J. C. Ross,* for appellee.

The verdict is not excessive and is amply supported by the evidence. Negligence was shown. 88 Ark. 138.

SMITH, J. This suit was brought to recover damages to a carload of cattle, sustained by reason of the negligence of the railway company in having the cattle loaded and held for so long a time at Fordyce, Arkansas, the point of origin of the shipment, before moving, that seventeen head got down in the car, as a result of which one died and was removed from the car before it was moved, four others died subsequently, and several were badly crippled. Plaintiff sued for $150, and recovered judgment for $100. It is said that the verdict is excessive,

and that under the undisputed evidence a verdict should have been directed in favor of the railway company, upon the ground that no liability was shown.

(1)  Discussing these questions in the order stated, it may be said that the verdict is not excessive, if there is any liability.  The plaintiff testified that one cow died before the car was put in motion, and that four other head of cattle died from the injuries sustained while the car was standing at Fordyce, and several others were injured.

The instructions given by the court were more favorable to the railway company than they should have been, and no exceptions were saved to any instructions given or refused except upon the ground that a verdict should have been directed in favor of the railway company.

It is argued that the jury did not follow the instructions given, and that no liability is shown under the undisputed evidence.  There does not appear to be any conflicts in the testimony, as the cause was submitted to the jury on the testimony offered in behalf of the plaintiff alone, and it may be stated as follows:  The plaintiff had made arrangements to ship two carloads of cattle on March 11, from Fordyce, Arkansas, to Leola, Arkansas, over defendant's road.  On the morning that the cattle were to be shipped, a man by the name of Morgan called the plaintiff and told him that he had some cattle for him and for the plaintiff to come to Fordyce and load them. The plaintiff went to the depot and made inquiry about cars, and was told, if he wanted the cattle shipped, he must get them down to the station so that they could be loaded when the train came.  Plaintiff then put in the cattle pen certain cattle referred to by the witnesses as the Morgan cattle, which he had bought that day, and he then told the agent of the railway company that he had two more carloads of cattle coming in, and the agent told him the train would be along about 6 p. m. and to get the cattle in by 5:30 p. m.  This conversation occurred about 2:30 p. m.  The plaintiff then went ahead and had the

other two loads of cattle brought in and, when he reached the station with the cattle about 5:30 p. m., he was informed by the agent that the train was late and would not arrive until about 9 or 10 o'clock. The stock pen was already filled up with the cattle that he had placed there earlier in the afternoon, so that there was no room in the stock pen for the cattle which plaintiff brought in at 5:30 p. m. The agent suggested to plaintiff that he get a lot in town to put his other cattle in, but plaintiff retorted that it was the railway's business to get the lot, whereupon the agent suggested, as a solution of the difficulty, that the plaintiff load the cattle which were already in the stock pen and make room for the cattle which he had just brought in. This was done, and the cattle were properly loaded between 5 and 6 o'clock p. m., after which the plaintiff went to his supper. Upon his return from supper, he found seventeen head of the cattle down in one car, and eight in the other. Plaintiff and four other men got into the cars and succeeded in getting the most of the cattle up before the train came. The train arrived about 9:30 p. m., when the cars were unloaded and all the cattle came out except the one which was dead. They dragged this one out of the car and left it at Fordyce. The others were then reloaded into the cars except one which sulked and could not be put in the car. This one, too, was left in Fordyce. The train then moved forward and the cattle arrived at their destination without any other untoward incident at 2:30 a. m.

We need not decide whether plaintiff was correct in his assumption that it was the duty of the railway company, and not his own duty, to secure a lot in which to confine the cattle which could not be accommodated in the cattle pen. The agent waived the point and received the cattle for shipment, and they were loaded in cars at his suggestion. It is true the plaintiff then knew the train was late, but the day was approaching its close and something had to be done with the cattle. They had been brought to the station under the direction of the

railway's agent. The railway company knew its facilities and was charged with knowledge of the movement of its trains. In 4 R. C. L. 951, it is said that "where a common carrier accepts live stock for transportation, knowing at the time that the condition of its facilities is such that a loss must result to the shipper by reason of the shipment, such carrier will be responsible for the loss because of its negligence in undertaking the shipment under such conditions." In support of the proposition stated, the author cites the case of *St. Louis S. W. Ry. Co.* v. *Mitchell,* 101 Ark. 289, 142 S. W. 168. In that case the court approved the following instruction:

"If you find from the evidence that the defendant railway company received two carloads of hogs from the Jonesboro, Lake City & Eastern Railway Company for transportation to East St. Louis, knowing that its stock pens at Jonesboro were so overcrowded that said stock could not be unloaded, then the fact, if it be a fact, that said stock pens were so overcrowded will not excuse the railway company if it is otherwise liable."

The testimony in that case was to the effect that the defendant railway company had the custom of unloading hogs at Jonesboro which it received from the connecting railway for shipment to St. Louis, and that the hogs in question were not unloaded because of the overcrowded condition of its pens. Discussing the law of the case, the court said:

"It is the duty of a common carrier of live stock to furnish all necessary facilities for the proper rest, exercise and refreshment of the animals received by it for transportation. The times when, and places where, rest and refreshment may be necessary must be left to the judgment of the carrier, and not the shipper. The shipper can not arbitrarily demand of the carrier that it unload the live stock at any particular time or place; but where the carrier has established a usage of unloading at a particular place for the proper care and necessary preservation of certain live stock, the shipper, in deliv-

ering his stock to the carrier for transportation without any notice of a change of usage, has the right to expect that such usage on the part of the carrier will be observed, and, if it is not observed, resulting in loss to the shipper, he may hold the carrier responsible for such loss. *Illinois Central Ry. Co.* v. *Peterson,* 68 Miss. 454; *Missouri, K. & T. Ry. Co.* v. *Clark,* 79 S. W. 827; *Nashville, C. & St. L. Ry. Co.* v. *Heggie,* 86 Ga. 210; *McAlister* v. *Chicago Ry. Co.,* 74 Mo. 351; Hutchinson on Carriers, section 638, and cases cited in note.''

(2)   So, here, we say that, when plaintiff was invited to tender his cattle for shipment, and when he did so pursuant to this invitation, he had the right to assume that the railway company had provided and would furnish the facilities needed, and if through the lack of them he was compelled to load his cattle into cars prematurely, and they were compelled to stand in the cars an unnecessarily long time before the cars were put in motion, he is entitled to recover damages to compensate the loss sustained thereby. *St. L. & S. F. Rd. Co.* v. *Vaughan,* 88 Ark. 138.

Judgment affirmed.