## OKLAHOMA NATURAL GAS CO. v. CORPORATION COMMISSION et al.

No. 14236—Opinion Filed Feb. 10, 1925.

Rehearing Denied June 23, 1925.

**1. Gas—Rates for Public Service—Efficient Service.**

The maximum rate which a public service corporation is authorized to charge for gas furnished to its consumers is based upon the condition that the corporation shall render efficient service for the charge. The term "efficient service" includes volume of gas, gas pressure, adequate supply, and quality of the gas.

**2. Same—Duty to Consumers.**

The public service corporation is obligated to furnish a fair, average quality of the general gas production, reasonably suited to meet the needs and requirements of its consumers.

**3. Same — Noncompliance with Order—Rebate to Consumers.**

The term "efficient service," as contemplated in fixing the maximum rate to be charged for the service, and the term "good quality," as used in order No. 1028, issued by the Corporation Commission, must be construed together. The two terms have reference to a fair quality and class of the available, general production from the fields, reasonably suited to meet the needs, demands, and requirements of the consumers. If there is a breach of this duty, the public service corporation will be required to make a refund or rebate of a sum of money equal to the loss suffered on account of the inefficient service as above defined.

**4. Corporation Commission—Jurisdiction of Controversies Between Public Service Corporations.**

The Corporation Commission has jurisdiction of controversies between public service corporations which are reasonably calculated to impair the capacity of one or both corporations to perform their public service obligation.

**5. Gas—Insufficient Service by Supply Company—Rebates.**

Record examined; held, that the evidence supports the findings of fact as to the inefficient service rendered by the Oklahoma Natural Gas Company; further, held, that the Oklahoma Natural Gas Company should be required to refund or rebate a sum of money to the Shawnee Gas & Electric Company equal to that sum which the latter is required to rebate to its consumers on account of the inefficient service of the delivering company.

(Syllabus by Stephenson, C.)

Commissioners' Opinion, Division No. 4.

Appeal from Order of the Corporation Commission.

Humphrey & Campbell and Ames, Lowe, Richardson & Cochran, for Oklahoma Natural Gas Company.

Lydick & Wilson, for Shawnee Gas & Electric Company.

E. S. Ratliff, for Corporation Commission.

Tom C. Waldrep and Mark Goode, for consumers of the City of Shawnee.

Iris C. Saunders, for the City of Shawnee.

Opinion by STEPHENSON, C. The Oklahoma Natural Gas Company is engaged as a producer, purchaser, and common carrier of natural gas for sale and delivery at the city gates to the distributing companies. The Shawnee Gas & Electric Company is engaged in the sale and distribution of natural gas to the consumers of the city of Shawnee. The gas which the distributing company furnished to the complaining consumers for the period of time involved in this controversy was purchased from the Oklahoma Natural Gas Company at the city gates of Shawnee.

The rate which the carrier formerly

charged the distributing company was 35 cents per cubic thousand feet. The rate which the distributing company charged the consumers was 45 cents per cubic thousand feet. The federal court for the Western district of Oklahoma allowed an increase in the rate of the consumer to 58 cents, effective with the meter month commencing December 20, 1921, and issued a temporary restraining order enjoining interference with the rate. The increase of 13 cents in the rate was ordered to be paid to the Oklahoma Natural Gas Company.

The Shawnee Gas Company filed its complaint before the Corporation Commission on February 11, 1922, against the Oklahoma Natural Gas Company, the city of Shawnee, and several of its gas consumers for relief on account of the alleged inferior quality of gas furnished by the Oklahoma Gas Company, for use by the gas consumers of the city of Shawnee, for the meter month commencing on December 20, 1921. The gas consumers of the city of Shawnee had met in mass meeting on February 9, 1922, to formulate some plan for securing relief on account of the inferior quality of gas furnished them for the preceding meter month. The mass meeting selected and appointed ten of its members as a committee to represent them in the matter of securing a refund for the inefficient gas service, and the committee was authorized to take suitable action to secure an equitable refund and discount on the gas bills in question. The distributing company joined this committee as a defendant in the action. The Shawnee Gas Company states in its brief that the committee was joined in the suit for the purpose of forestalling any action on the part of the committee to have a receiver appointed by the district court of Pottawatomie county for the conduct of its business in distributing gas to the consumers. Whether or not the committee might have taken such action, or if it had done so, whether or not it would have been sustained, is not material in the disposition of this case.

The petitioner alleges that it has about 3,400 consumers in the city of Shawnee who are complaining about the inferior quality of gas furnished them in the preceding month; that a considerable number are refusing to pay for the alleged poor service. The petitioner sums up the complaint in the following language:

"The plaintiff is unable to state the nature of the said gas, but is informed and believes and upon such information and belief alleges it to be true that the gas furnished to plaintiff, as aforesaid during said periods of time, contained an excessive amount of nitrogen, nitrogen gas, being a dead gas and one which will not ignite and burn."

The petition of the Shawnee Gas Company indicates that it was the purpose of the petitioner to bring the question of the inefficient service before the Commission for such rebate or discount as was proper to be allowed the consumers, and that the carrier company be ordered to rebate to the petitioner the total sum of the discount allowed in favor of the consumers.

Several of the citizens of Shawnee and the committee appointed by the mass meeting, who were joined in the action by the distributing company, filed their answer in the cause about February 13, 1922, repeating the charges made by the distributing company. The Commission entered an order in the cause on February 14, 1922, in substance: First, that any dissatisfied consumer might place the amount of the bill for the disputed service in some bank in Shawnee and file complaint in the cause pending the outcome of the objections to the service; second, the distributing company was enjoined from discontinuing service after the deposit was placed in escrow; third, the consumers were authorized to accept the benefits of the orders on or before February 17, 1922; fourth, the amount of the bill placed in escrow was to be paid to the distributing company, if the consumer did not file his complaint in the cause within 15 days after February 17th.

The Oklahoma Natural Gas Company filed its answer on February 14th, which was in substance: First, a general denial of liability; second, the petition does not advise it of the purposes for which it was joined; that if it was for the purpose of charging any refund allowed to the consumers and against it, the order would amount to the taking of property without the due process of law, in violation of the 14th Amendment to the Constitution of the United States and contrary to section 7 of art. 2 of the Constitution of the state of Oklahoma; third, that the rate it charged and collected from the distributing company was fixed by order of the federal court for the Western district of the state of Oklahoma, and that the rate was made effective by a temporary restraining order, and that any order directing the defendant to make a refund would violate the rate and restraining order; fourth, that it furnished gas to the distributing company in accordance with the laws of the state of Oklahoma and the orders of the Commission.

The distributing company filed its supplemental petition in the cause on May 22, 1922, in which it set forth the names of the consumers who had made deposit in escrow in accordance with the previous order of the Commission. It appears from the supplemental petition that about 80 consumers had accepted the benefits of the order and deposited a total of $1,560.26 in escrow as provided by the order.

The Commission took testimony and heard the cause on several subsequent dates, and finally closed the hearing on June 23, 1922.

The Commission made its findings of fact and rendered its judgment and order No. 1261, on February 1, 1923. The findings of fact, in substance, are: First, that the Oklahoma Natural Gas Company furnished gas of an inferior quality at the city gates to the distributing company for the meter month commencing December 20, 1921; second, that the gas as supplied would not furnish sufficient heat to meet the ordinary requirements of the consumer; third, that the service was lacking in efficiency on that account to the extent of 12½ per cent. for the meter month in controversy.

The order was, in substance: First, that the Oklahoma Natural Gas Company refund and rebate to the Shawnee Gas & Electric Company 12½ per cent. for the meter month commencing on December 20, 1921, within 30 days after the date upon which the order became effective; second, that the Shawnee Gas & Electric Company refund and rebate to its gas consumers, in the city of Shawnee, 12½ per cent. of the gas bills charged for the same meter month.

A copy of the findings of fact and order were served on the Oklahoma Natural Gas Company on April 5, 1923, and it perfected its appeal to this court, which is styled "Oklahoma Natural Gas Co. v. Corporation Commission et al., No. 14236." The Shawnee Gas Company appealed from the order to this court, which is styled "Shawnee Gas & Electric Co. v. Corporation Commission of the State of Oklahoma, No. 14471."

The particular complaint of the Shawnee Gas Company is that the order of the Commission should have compelled the delivering company to compensate it for the full refund to the consumers. The order of the Commission required a rebate to the distributing company of 12½ per cent. of the amount received by it at the city gates.

The Oklahoma Natural Gas Company assigns as errors for the order: First, that

the order is contrary to the law and evidence; second, that the order is violative of the 14th amendment of the Constitution of the United States.

The Shawnee Gas Company has made similar assignments of error for reversal.

Cause No. 14471 was consolidated with this appeal for the purpose of hearing both cases together.

The Oklahoma Natural Gas Company attacks the order under the first assignment from several standpoints: First, the Commission has not prescribed the number of b. t. u's a cubic foot of gas should contain; second, the Commission has not defined what constitutes a standard gas for domestic use; third, that only a small number of the gas consumers were before the court; fourth, that only those before the court were entitled to relief; fifth, that the gas was of the kind and quality it was required, by law, to deliver to the distributing company.

The complaint of the petitioners is that the gas did not make sufficient heat to warm the homes and cook the food, and that they were not given efficient service.

The most that the delivering company is justified in claiming in relation to the non-expert testimony, is that there was a sharp dispute between the parties as to the efficiency of the gas service (efficiency of the gas controls the efficiency of the service). The persons who testified that the gas would not burn and give off heat far exceeded, in number, those who testified that the service was satisfactory. The evidence does not indicate a lack of credibility on the part of the witnesses, who testified as to their experience in the use of the gas. The testimony of the gas consumers fairly supports the findings of fact made by the Commission, that the gas consumers of Shawnee received an inferior quality of gas service for the meter month. Findings of fact made by the Commission are, by section 22, art. 9, of the Constitution, prima facie reasonable and correct. A., T. & S. F. Ry. Co. v. State, 23 Okla. 210, 100 Pac. 11, 21 L. R. A. (N. S.) 908; Guthrie Gas, Light & Fuel & Imp. Co. v. Board of Education, 64 Okla. 157, 166 Pac. 128.

The Shawnee Gas Company at the hearing made the following admission:

"The record may show, as far as the Shawnee Gas and Electric Company is concerned, anything our pleadings show. We will not only act but assert that this was not only a highly unsatisfactory gas that would not burn satisfactorily, from the

23rd of December to the 28th, inclusive, and again on the 11th day of January, and on the 13th, and which covered the whole town except here and there some particular stove would burn, but generally, it would not burn, and the testimony we will offer this morning will be strictly in line with the chairman's suggestion."

The answer of the delivering company as made to the charge of furnishing an inferior quality of gas, is: First, that it furnished gas from the general, average production of the several gas fields; second, that the stoves could have been adjusted so as to burn the gas as furnished with sufficient heat to meet the reasonable requirements of the consumers.

We will refer to these propositions later.

The heating property of gas is hydrocarbon, which is composed of methane and ethane. The nitrogen, which acts as a dilutant of the oxygen in common air, enters into natural gas as a diluting element. It is defined as an inert, noncombustible element, which does not produce heat, and passes through the meter and burning appliance without change, but, we assume, not without effect on the meter. Some of the chemists testified that nitrogen entered into natural gas to the extent of about two to ten per cent. We assume this answer has reference to the general gas production of the country. Some of the authorities on the question place the percentage of nitrogen as low as one and one-tenth of one per cent. The record does not make it clear whether the answer means that ten per cent. is the maximum of nitrogen or that any gas containing more than ten per cent. is not considered merchantable. It must not mean that nitrogen is not found in a greater quantity than ten per cent., as the testimony of the delivering company's chemist shows that the gas delivered at the gates to the distributing company contained a much greater percentage of nitrogen. It appears that the delivering company secures its gas from several gas fields through its pipe lines, and runs the gas through a mixing station before delivering to the distributing company. A chemist for the delivering company testified in relation to the heating properties of gas, as follows:

"Q You may tell us, please, what it is that determines the value of natural gas for heating purposes? A. It is the hydrocarbon member, consisting of ethane and methane".

Another gas expert testified in relation to nitrogen in gas as follows:

"Q. Then the presence of nitrogen does not affect the gas, just whether it will burn or not? A. The value of it depends on its heating value and not on the percentage of nitrogen".

It is said by the defendants that the number of B. t. u.'s which a cubic foot of gas contains determines its heating value. It is equally true that the varying, component elements of natural gas determine the number of B. t. u.'s in a cubic foot of gas.

A British thurmal unit is defined as being the amount of heat required to raise a pound of water one degree Fahrenheit.

The Oklahoma Natural Gas Company offered proof of several tests made by one of its chemists of the gas delivered to the consumers, covering 20 days of the meter month involved in this case:

| Date | Methane | Ethane | Nitrogen | B. T. U.s |
|------|---------|--------|----------|-----------|
| 1- 5-22 | 68.5 | 13.33 | 18.2 | 925 |
| 1- 4-22 | 55.4 | 20.11 | 24.4 | 912 |
| 1-23-22 | 58.23 | 18.88 | 22.89 | 919 |

The nitrogen content of the gas was an average of 21.83 for the first 20 days of January, which covers two-thirds of the period of time involved in this suit.

The Oklahoma Natural Gas Company offered proof for the four months following the month covering the controversy, as follows:

| Date | Methane | Ethane | Nitrogen | B. T. U.s |
|------|---------|--------|----------|-----------|
| 2-27-22 | 95.27 | 3.69 | 1.04 | 1025 |
| 3- 2-22 | 91.10 | 5.10 | 3.80 | 1015 |
| 3- 5-22 | 84.70 | 10.20 | 5.10 | 1033 |
| 3-10-22 | 78.55 | 8.22 | 15.23 | 901 3 |
| 4- 1-22 | 87.96 | 10.3 | 1.74 | 1069 |
| 5- 1-22 | 89.76 | 7.13 | 3.11 | 1030 |

The average nitrogen content was five per cent. for the four months following January 20th, as compared with 21.83 per cent. of nitrogen contained in the gas for two-thirds of the period of time covered by this controversy. No explanation is offered, either, for the difference of 16.83 nitrogen percentage between the two periods of time, or the high nitrogen percentage on March 10th. In fact we are not justified in taking the nitrogen content of March 10th for the general average, as the test does not indicate that it was the average nitrogen content of the gas available to the delivering company.

We will resolve the benefit of the doubt in favor of the delivering company and take the five per cent. nitrogen content as shown by the four months test, as the nitrogen basis of the general gas production in the fields, for the purpose of deciding this case.

The excessive 17 per cent. of nitrogen

contained in the gas for the 20 days in January displaced 17 per cent. of the hydrocarbon; consequently, the heating power was reduced 17 per cent. The Commission found that the inefficient service represented 12½ per cent. for the 30 days. The difference between the findings of the Commission and the conclusions to be drawn from the tests offered in evidence by the delivering company is not sufficient to support the attack made by the Oklahoma Natural Gas Company upon the order on the ground of insufficient testimony to support the findings of fact.

It may be that the stoves could have been adjusted so as to enable the appliances to burn a sufficient volume of gas to create the required heat, but the meter would have shown the use of 17 per cent. plus 100 per cent. of gas on the basis of the test made for the four months following. The volume of 117 per cent. for the month in controversy did not exceed the units of heat contained in the 100 per cent. volume furnished during the four following months.

The testimony of one of the experts supports this conclusion:

"Q. Does the presence of nitrogen add anything to the gas? A. No, sir. Q. We pay for 25% of nitrogen, if this analysis be correct? A. Yes, sir".

It may be that there are gas wells in the fields which produce a nonmerchantable gas, or are high in the percentage of nitrogen as testified to by an officer of the Oklahoma Natural Gas Company:

"Q. Was there any peculiarity about the main No. 4 well? A. It was high in nitrogen".

The Oklahoma Natural Gas Company undertakes to justify the delivery of the gas, if it was of poor quality, on the ground that it is required to receive gas ratably from the producers in the several fields, under the provisions of section 7924, Comp. Stat. 1921. The last sentence of the section reads as follows:

"The Corporation Commission shall have authority to make regulations for the delivery, metering, and equitable purchasing and taking of all such gas and shall have authority to relieve any such common purchaser, after due notice and hearing, from the duty of purchasing gas of an inferior quality or grade".

The delivering company is in the field, both purchasing and producing gas for transportation and delivery at the city gates to the distributing company. It is in a position to be well advised of the quality of the gas being produced and offered for sale. The law wisely placed the burden on the carrier company to deliver gas to the distributing company reasonably suitable to meet the requirements of its consumers. Ample provision is made by section 7924 to protect the delivering company against the necessity of purchasing gas of an inferior quality. The distributing company, on account of the needs of the consumers, is not in a position to refuse the gas delivered to it at its city gates because it is of an inferior quality. The delivering company should receive and deliver the gas to its consumers. The responsibility for so delivering the inferior gas to the consumer is ultimately with the carrier company. The order of the Commission is questioned, further, on the ground: First, that the consumers who were parties to the action were without authority to represent the other consumers who were not parties to the action; second, that only about 80 consumers complied with the first order of the Commission to make deposit of their bills in escrow.

The distributing company brought an action for the benefit of its 3,400 consumers, as well as for its own protection. The company joined as one of the defendants the committee selected by the mass meeting for the purpose of taking proper action in the adjustment of the controversy. The authority of the distributing company and the committee to take such action does not appear to have been questioned in the proceedings, and the order appealed from will be treated as having been made for the benefit of the consumers represented by the committee, and distributing company. The first order, to the extent of requiring each consumer to file his separate complaint in the action, was not supported by the record, and was contrary to the record, for the reason that the distributing company and the committee were in the cause before the Commission duly authorized the act for all the consumers.

The order is questioned on the ground that it is contrary to law.

Chapter 93, Sess. Laws of 1913, gives the Corporation Commission general supervision over all public utilities with power to establish rates and to prescribe rules, requirements and regulations relating to their service for the public.

The Corporation Commission is vested by law with authority to prescribe rates to be charged by public service companies for gas delivered to their consumers. The maxi-

mum rate fixed by the Commission is based upon 100 per cent. efficient service to be had from a "given volume" of natural gas. The term "given volume" of gas has reference to the quality and class of gas, which the Corporation Commission contemplates should be delivered to the consumer to meet the requirement for 100 per cent. efficient service upon which the rate is based. The statement of the rule meets with less difficulty than its definition. There are four persons concerned; the producer of the gas, the common carrier to the city gates, the distributing company, and the consumer. The first three parties are entitled to a reasonable return for their property and service. The duty rests upon the former three parties to deliver a fair quality of gas from the general gas production of the field to the consumer, reasonably suited to meet the requirements of the latter, with no greater burden than a reasonable profit to the three former parties. The situation and relation of the parties. one to the other, require the application of the golden rule, "live and let live". The rule for ascertaining the "given volume" of gas as contemplated by the Commission, to constitute 100 per cent. efficient service, is a question of law for the Commission and court; whether or not the gas as furnished to the consumer for a given period of time, equals the degree of efficiency or quality upon which the rate is based, is a question of fact to be established by proof in the particular case. The percentage of hydrocarbon and nitrogen contained in natural gas determines its heating value and the heating value of a cubic foot of gas establishes its number of B. t. u.'s. If the fair average of the general production from the gas fields contains four or five per cent. of its diluting agency, known as nitrogen, its volume would give the 100 per cent. efficiency contemplated by the Commission in fixing the rate.' The burning of this quality of gas would give a certain number of heating units and the stove would consume a "given volume" of gas in a certain period of time. The gas company may then dilute the same gas with nitrogen or by any other means, to the extent of 20 per cent., which would result in displacing 20 per cent. of the heating properties of the gas. It would then be necessary for the consumer to readjust his stove so that it would consume 20 per cent. plus 100 per cent. for the given period of time in the first instance, to give the number of heating units equal to the number of heating units received in the first instance. The consumer would receive the same heating units as in the former period of time, but

would consume a greater volume of gas than used in the first instance. This would not constitute efficient service as measured by the standard upon which the rate is based. The term "efficient service" includes pressure, volume of gas, quality of gas, and the quality of gas generally produced in the fields and available for supplying the consumers. All these elements and the general conditions must be taken into consideration in determining what the Commission meant in using the term "adequate supply and good quality of gas," in order No. 1028. The term as used in order No. 1028 must be construed in the light of the conditions and circumstances entering into the action of fixing the rate for gas to the consumer by the Commission. What might be a good quality of gas as defined by the order under one condition, might be a poor quality under the conditions and circumstances existing during another period of time. Oklahoma Natural Gas Co. v. State et al., 78 Okla. 5, 188 Pac. 338, 258 U. S. 234, 66 L. Ed. 590; Nowata County Gas Co. v. State et al., 72 Okla. 184, 177 Pac. 618.

The nitrogen content furnished the consumer during the period of time covered by this controversy was about 18 per cent. greater than that for the four following months. No reason is offered as to why the excessively diluted gas was furnished to the consumers. The court must assume, in the absence of any explanation, that the Oklahoma Natural Gas Company could have furnished the Shawnee Gas Company gas containing 18 per cent. more heating units for the same period of time than was furnished. This places the delivering company in the attitude of having breached its duty in the degree of service it ought to and could have furnished to the consumers during the period of time in controversy; consequently, the order of the Commission is in accord with the law applicable to the case.

The assignment of error based on the taking of its property without due process of law must fall, as it appears that the order of the Commission was in accordance with the law applicable to the case.

We may here answer the claim of the delivering company that it did not breach its duty in furnishing the gas of the particular quality to the consumers for the reason that the Commission had not fixed a given number of B. t. u's which the gas should contain at all times. It is apparent from what has been said that the Commission could not require the gas company to deliver gas of a certain number of B. t. u.'s,

or of a given precentage of nitrogen, or of a given percentage of hydrocarbon, at all times, under the varying conditions and circumstances. It would be contrary to law if it should do so, as rebates or refunds charged against the gas company must be in relation to a corresponding degree of inefficient service. A direction to rebate or refund contrary to the latter rule would be in the nature of an unwarranted penalty, and amount to a taking off the gas company's property without due process of law. If this was the situation, the authorities cited by the defendants to uphold the claim of taking property in this case without due process of law would support their contentions. K. C. Gas Co. v. K. C., 198 Fed. 500; Chicago v. Gunning System, 214 Ill. 628, 73 N. E. 1035, 70 L. R. A. 230, 2 Ann. Cas. 892; H. & T. R. Co. v. Mays, 201 U. S. 321; St. L. & S. F. Ry. Co. v. Clay Gin Co. (Ark.) 92 S. W. 531; Consolidated Gas Co. v. State of New York, 157 Fed. 849, 53 L. Ed. 382; 212 U. S. 382; S. W. Tel. and Tel. Co. v. Danaker, 59 L. Ed. 1419; Great Northern Ry. Co. v. State of Minn., 59 L. Ed. 1337; St. L., I. M. & S. Ry. Co. v. Winne, 56 L. Ed. 799; C., B. & Q. Ry. Co. v. Chicago, 41 L. Ed. 979; Cotting v. Goddard, 46 L. Ed. 92.

The conclusions reached answer all of the contentions of the distributing company, except its contention that the carrier company should refund to it the amount it was required to refund to the consumers.

The carrier company was obligated to deliver to the distributing company a commodity of a certain quality and quantity for a given sum of money, and the latter owed the duty to deliver the same gas to the consumers. The findings of fact show that the carrier company delivered a commodity of less value to the distributing company and the latter company delivered the same gas to the consumers.

This action is not in the nature of fixing a rate for the class of the commodity delivered, but is an action to cause the carrier company, which was obligated to deliver a commodity of a certain class and kind, to make good its failure to deliver the quality of commodity that it was obligated to furnish to the distributing company.

A controversy between two public service corporations is not, ordinarily, a subject-matter over which the Corporation Commission has jurisdiction, unless the controversy is of such a nature as is reasonably calculated to impair the power of one or both of the corporations to perform its public service duties. The rate allowed the Shawnee Gas & Electric Company for delivering gas to its consumers contemplates merely a reasonable return. The Corporation Commission in fixing the rate had in contemplation that the Oklahoma Natural Gas Company would deliver to the distributing company a kind and quality of gas the consumers were entitled to receive under the given circumstances and conditions. The supposition rested upon the principle that the parties concerned in the delivery of the gas would perform the legal duties they owed one to the other. The distributing company had no choice in the selection of the gas which is transported to its city gates. The distributing company is not in a position to re-use the gas delivered at its gates by the carrier for the reason that the consumers have a continuing need and requirement for gas. It cost the Shawnee Gas & Electric Company just as much to deliver the quality of gas it received as if it had been of the proper kind and quality. The carrier company is in the field where it may be advised of the kind and quality of gas produced, and the kind and quality it ought to deliver to the distributing company. It is reasonable to suppose that it pays for the gas produced according to its heating value. If the carrier company is required merely to refund a percentage to the distributing company, equal to the deficiency in the gas, it has not lost anything by the transaction. It has merely returned a sum of money equal to the quality of the commodity which it failed to deliver to the distributing company. If the carrier company was permitted to confine its refund merely to a percentage, equal to the deficiency in the product delivered to the distributing company, it would be in a position to destroy the distributing companies. The refund made by the carrier company is not, in fact, a loss to the latter, as it is supposed that the carrier company purchased the quality of gas according to heating units. Therefore, it is apparent that the question of the amount the carrier company should refund to the distributing company is a question which concerns the welfare of the gas consumers of Shawnee. It is very apparent that the action of the Oklahoma Natural Gas Company has damaged the distributing company to the extent of 12½ per cent. of the sum charged the consumers for their service. The loss to the distributing company of 12½ per cent. of the charge of 58 cents per cubic thousand feet is due to the wrong of the Oklahoma Natural Gas Company, and a wrong which the distributing company was not in a position to prevent or avoid. The question to determine is whether or not the damage suf-

fered by the delivering company is likely to impair its ability to perform the duties it owes to the consumers. It is clear that the consequences from the wrong of the Oklahoma Natural Gas Company is reasonably calculated to impair the ability of the delivering company to perform the duty it owes to the consumers. Therefore, the Corporation Commission had jurisdiction to settle the entire controversy between the two gas companies. The Corporation Commission should have ordered the Oklahoma Natural Gas Company to refund to the distributing company the amount the latter was required to refund and rebate to its consumers. Oklahoma Gas & Elec. Co. v. Okla. Natural Gas Co., 85 Okla. 25, 205 Pac. 768.

It is recommended that the order of the Commission be reversed and remanded with directions to modify its order accordingly.

By the Court: It is so ordered.

Note.—See under (1) 28 C. J. p. 578 (1926 Anno); (2) 28 C. J. p. 564 (1926 Anno); (3) 28 C. J. p. 578 (1926 Anno); (4) 28 C. J. p. 560 (1926 Anno); (5) 28 C. J. p. 578 (1926 Anno.)